IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| JOSEPH S. HAMILTON, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>JOHN E. POTTER, United States )<br>Postmaster General, et al., )<br>)<br>Defendants. ) | No. 2:05-cv-231 |

## **MEMORANDUM OPINION**

This civil action is before the court on the motion for summary judgment filed by defendants American Postal Workers Union, AFL-CIO and the Northeast Tennessee Area Local 365 [doc. 44]. Defendant John Potter has filed a response joining in the motion for summary judgment [doc. 49]. The plaintiffs responded [doc. 50], and numerous reply briefs, sur reply briefs, and supplemental briefs and responses have been filed. The court has considered all the pleadings and for the reasons discussed below the defendant's motion will be granted.

The plaintiffs, all employees of the United States Postal Service in Johnson City, Tennessee, and all members or former members of the defendant unions, allege in their amended complaint that the Postal Service was in violation

of the Collective Bargaining Agreement ("CBA") because it was using casual employees rather than paying the plaintiffs overtime. The plaintiffs further allege that the defendant unions deliberately abandoned a meritorious grievance related to the use of the casual employees and did not fairly represent the plaintiffs. The plaintiffs seek compensatory and punitive damages from all the defendants and attorney's fees and costs.

### I.  Factual Background

Before setting out the material facts related to this civil action, a general explanation of types of employees used by the Postal Service will be helpful. There are three types of employees relevant to this lawsuit. First, there are full-time employees who hold "bid" jobs at the post office. Second, part-time flexible ("PTF") employees are career Postal Service employees who can be assigned various shifts and departments within the post office and are entitled to health care benefits. Full-time employees usually have passed through the PTF classification. Finally, there are casual employees who are temporary, at-will employees who are not protected by the CBA and have no employee benefits. The Postal Service's use of this later classification of employee has been the subject of numerous grievances, arbitration, and contract bargaining.

The CBA in this case specifically provides for the use of casual employees. It states:

2

> The supplemental work force shall be comprised of casual employees. Casual employees are those who may be utilized as a limited term supplemental work force, but may not be employed in lieu of full or part-time employees.

Doc. 76, exh. C, Collective Bargaining Agreement, Art. 7.1.B.1. A binding arbitration opinion issued in August 2001 authored by Shyam Das ("Das Award"), further defines the scope of the use of casual employees. It sets out the "circumstances under which it is appropriate to employ (hire) casual employees to be utilized as a limited term supplemental work force consistent with Article 7.1.B.1:"

> Generally, casuals are utilized in circumstances such as heavy workload or leave periods; to accommodate any temporary or intermittent service conditions; or in other circumstances where supplemental workforce needs occur. Where the identified need and workload is for other than supplemental employment, the use of career employees is appropriate.

Doc. 44, exh. 6, Das Award, p. 51.

In his Second Declaration, plaintiff Hamilton says he became concerned in 2001 after the Das Award was issued that the Postal Service was violating the rules concerning the use of casual employees. He says that in 2001 he asked Gaines Fields ("Fields") to file a class action grievance protesting the Postal Service's continuous use of casual employees instead of career employees. Fields was the Area Director for Local 365 of the American Postal Workers Union, AFL-CIO ("Local") from January 2001 until January 2003 when

3

he was elected President. He served as President until January 2007. Hamilton states that Fields as Area Director had the authority to file such a grievance.

Thereafter, Hamilton avers that he and other employees repeatedly asked Fields about the status of the grievance, and Fields told them that the grievance had been filed, but that the Postal Service was stalling and would not give him the necessary documentation. In fact, Fields did not file a grievance until June 2003. In his declaration, Fields states that a grievance protesting the use of casual employees was filed in 2001 by Roger Simpson, the President of the Local union at that time. However, there is no further information concerning this grievance in the record. Hamilton felt that Fields had been deceiving him about filing the grievance.

In any event, a class action grievance was filed by Fields in June 2003 alleging that the Postal Service was using casual employees on a continuous basis in violation of the collective bargaining agreement and the Das Award. The grievance states:

> Management uses casuals on a year-round, continuous
> basis in the automation section. They are using casuals
> in lieu of career employees. Management has let a
> number of PTF transfer to the carrier craft, while
> keeping casuals to do the work that the PTFS did
> before.

The grievance was denied at Step 1 of the grievance process. Fields then filed a Step 2 grievance appeal. On July 9, 2003, H.C. Field, the Postmaster of the

4

Johnson City Post Office, denied the grievance. In relevant part, his denial stated:

> Management takes the position that its use of casuals is consistent with the Shyam Das Arbitration Award . . . and offers the attached matrix to support this position.[1] The matrix establishes that casuals were used to cover for temporary vacancies, to cover extended absences, to cover for temporary light and limited duty assignments, to augment the work force during heavy volume periods, and to provide coverage during the choice vacation period. Management points out that the actual number of casual employees used fluctuates throughout the year in accordance [with] the justifying factors established in the Das Award. Management maintains that its year round use of casuals is not inconsistent with the Das Award. Management also reminds the union of its agreement that the Local MOU [memorandum of understanding] required that the casuals be used in automation duty assignments.

Fields timely appealed the Step 2 denial of the grievance to arbitration. However, this was improper under the terms of the CBA and it was sent back so it could be appealed to Step 3 instead of to arbitration.[2] The following reasons were given for the Step 3 appeal:

> (1) Postmasters justification for use of casuals dose [sic] not comply with DAS award.
> (2) Casuals can not [sic] be used to replace employees who are filling in for management.

---

[1] There are several copies of the Das Matrix in the record, but the most legible is an exhibit to H.C. Field's declaration which is attached to the Postal Service's response, doc. 55.

[2] "Disciplinary grievances or contract grievances which involve the interpretation, application of, or compliance with the provisions any Memorandum of Understanding not in conflict with the [CBA]" may be appealed directly to arbitration from Step 2. Doc. 76, CBA, Art.15.2.(Step 2)(h).

>(3) Management can not [sic] bring casuals in to work them in automation and claim they are filing [sic] in for people on light duty who [sic] jobs are in the manual section.
>(4) Management let three PTFS transfer to the carrier section then replaced them with casuals. If management had replaced the PTFS then the casuals would not be needed. In fact management plains [sic] on letting two more transfer to the carrier section.

At Step 3, the parties agreed to remand the grievance to Step 2 so that management could provide clock rings or other time records for the casual employees.

Fields describes the clock rings as providing "information such as when the employee begins and ends his or her shift and the operational area in which the employee is working" and whether the employee is a casual employee. Fields requested clock rings for eight casual employees for the period June 20, 2002, through June 20, 2003. Fields stated that after reviewing the clock rings and meeting informally with the Postmaster, he concluded that the Postmaster's explanations as to why casual employees had been used were legitimate with one exception. One casual employee had been used for one month (July to August 2002) to fill in for a regular employee who was temporarily filling a supervisor position. Fields believed that this was an improper use of a casual employee.

Fields stated that he met with National Business Agent Billy Woods and explained his conclusions as to the use of the casual employees, but he did

6

not discuss the one exception because it was an undecided question. Fields was concerned that this one brief violation was not enough to carry the union's burden of proof at arbitration, and it might result in an adverse decision that would have a negative impact on future grievances. He and Woods decided not to advance the grievance.

At the Local's meeting in March 2005, Hamilton inquired as to the status of the grievance. Fields claimed that he did not recall the details, that he would check into it, and he would report at the next meeting. At the May 2005 meeting, Fields reported that the grievance had been withdrawn because "upon further investigation, it lacked merit."

Hamilton's recollection of the events surrounding the March 2005 meeting differ. Hamilton says that he became concerned about the status of the grievance and had the Local's vice president check on it before the meeting. The Birmingham National Business Agent's office told him that the grievance had been closed because the union had not sent the clock rings to the National Business Agent. After reviewing the grievance file, Hamilton called Billy Woods to find out why the class action grievance was closed. Woods told Hamilton that he never received the clock rings, but that it was still a good grievance and could be pursued if he could get the clock rings.

Hamilton claims that Fields told him at the March 2005 meeting that he had sent the grievance "down the road" (meaning to the next step) and that he

7

had done all he needed to do. When asked whether he had sent the clock rings to the National Business Agent, Fields said he did not know. Fields told the union members that he would investigate the status of the grievance, that he would pursue it until it was done, and that he would report on the status at the next meeting. Hamilton withdrew his membership in the union immediately prior to the March 2005 meeting.

Hamilton states that Fields did not report the progress of the grievance to the union membership, nor did he report his decision to withdraw the grievance. Hamilton contends that the CBA requires that any settlement or withdrawal of a grievance be in writing (CBA, Art. 15.2.(Step 2)(e)) or noted on the standard grievance form. The only written indication that the grievance was abandoned was a "closed out" notation on a Postal Service form used to track grievances. That form also states that the union never met with management again after the remand. Doc. 51, Hamilton's Declaration, exh. B.

## II. Legal Discussion

*A. Summary Judgment Standard*

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." As the Supreme Court stated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322

8

(1986), this "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Thus, the moving party's burden may be discharged by showing that there is an absence of evidence to support the non-moving party's case.  *Id.* at 325.  In order for a non-moving party to defeat a motion for summary judgment, the non-moving party must come forward with persuasive evidence to support his or her claim or demonstrate that there is a genuine material factual dispute; that is, the non-moving party must produce evidence on which the jury could reasonably find for the non-moving party.  *Id.* at 324.  All facts and inferences should be viewed in the light most favorable to the non-moving party.  *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 238 (6th Cir. 1994).

### *B. Breach of Duty of Fair Representation*

The United States Supreme Court recognizes that a union has a duty of fair representation of its members.  *Vaca v. Sipes*, 386 U.S. 171, 190 (1966).  A breach of that duty "occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."  *Id.*  While a "union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," the collective bargaining system gives the union the "discretion to supervise the grievance machinery."  *Id.*  "A union does not breach

9

its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." *Id.* at 192. Further, "a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious." *Id.* at 195. Finally, the three components of the duty of fair representation are separate, and a plaintiff need not establish all three. *See Driver v. United States Postal Serv., Inc.*, 328 F.3d 863, 869 (6th Cir. 2003); *Walk v. P*I*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir. 1992).

In their motion for summary judgment, the unions argue that Fields's decision not to advance the grievance was reasonable and within his discretion. The unions argue that Fields presented a rational reason for his decision not to pursue the grievance, and even if the decision was a mistake in judgment, it would not be a breach of the unions' duty of fair representation. *See Walk*, 958 F.2d at 1326. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (citation omitted).

Fields stated in his declarations that he filed the grievance based on his observations of the use of casual employees, but after studying the Das Matrix and the clock rings and talking with the Postmaster, he concluded that with one exception the use of casual employees complied with the Das Award and the

10

CBA. He decided not to pursue the one case because it involved the use of a casual employee for one month, and the use was an undecided issue. He believed that it was not a strong enough case to take a chance on an unfavorable arbitration decision.[3]

The plaintiffs argue that there are several reasons why Fields's decision was arbitrary and/or taken in bad faith: (1) the Postal Service had no legitimate defense to the grievance; (2) the Postal Service's Das Matrix was a "fraud"; (3) the unions breached the CBA by "secretly" dropping the grievance; (4) Fields repeatedly misrepresented the status of the grievance; (5) Fields's declarations are not credible; and (6) the Postmaster's declaration is "significant for what it does not say."[4] These arguments are based mostly on plaintiff Hamilton's disagreement with Fields's interpretation of the Das Matrix and the clock rings and his handling of the grievance.

The plaintiffs' first contention cannot establish an unfair representation claim. Even if the plaintiffs could prove that the grievance was meritorious, a breach of the duty of fair representation is not established. *See Vaca*, 386 U.S. at 195.

---

[3] The court notes that pursuing the questionable use of the one casual employee might have been problematic also because it occurred from July to August 2002 and the grievance was not filed until June 2003, well past the fourteen day limitation period required by the CBA.

[4] The plaintiffs have not explained what they mean by this statement.

11

Next, the plaintiffs argue that the Das Matrix provided by the Postal Service at Step 2 of the grievance process is a fraud. The Das Matrix lists the employees whom casuals replaced, the reason why a replacement was needed, and the number of casual employees used during a given month. Hamilton says that casuals were used in the automation section to replace employees who worked in other sections, so the Das Matrix does not justify the use of casuals. In response, the Postal Service correctly cites to the Das Award: "'There is no restriction as to how such casual employees may be utilized (assigned).'" Doc. 44, exh. 6, Das Award, p. 13 (quoting 1985 Zumas National Decision) (internal quotation marks omitted). Later, Das stated that in his opinion the CBA does not "restrict the utilization of casuals, who have been properly employed to perform overtime assignments, or more broadly, any particular category of assignments." *Id.* at p. 39. In other words, a properly hired casual may be assigned to work wherever needed, not necessarily at the work station of the employee who is on light duty, vacation, etc. Thus, Hamilton's premise about the Das Matrix is incorrect. In addition, Hamilton does not dispute that the stated reasons for hiring casuals to replace employees were not legitimate – only that casual employees were assigned to work in automation for employees who worked at other workstations.

The plaintiffs also contend that Fields misrepresented the status of the grievance by telling Hamilton that the grievance had been filed in 2001 when

12

Fields did not file it until 2003, and then not telling the union members that the grievance had been abandoned and not putting the withdrawal in writing. First, there is undisputed evidence in the record that a grievance concerning the use of casuals was filed in 2001 by the then President of the Local. If the grievance was filed, this may have been the grievance that Fields referred to when questioned by Hamilton. Second, as to the plaintiffs' contention that Fields acted in bad faith by not telling the union members that the grievance had been abandoned, the unions correctly point out that negligence or poor judgment in failing to keep the plaintiffs informed of the status of the grievance is "not sufficient to support a claim of unfair representation." *See Whitten v. Anchor Motor Freight, Inc.*, 521 F.2d 1335, 1341 (6th Cir. 1975). Finally, the CBA requires that settlement or withdrawal of grievances be in writing or noted on the standard grievance form. The only "final" document submitted to the court is the Postal Service's form which indicates that the grievance was "closed out" in February 2004. In any event, the court finds that even if Fields's decision not to advance the grievance should have been in writing, this alone is not sufficient to establish a breach of duty of fair representation.

The plaintiffs also argue that the Postal Service's form shows that, contrary to Fields's declaration, he did not meet with the Postmaster after the grievance was sent back to Step 2. The document states: "CLOSED OUT. MGMT SENT SAME STEP 2 DENIEL [sic] BACK. UNION NEVER MET WITH

13

MGT AGAIN AFTER REMANDED FROM STEP 3." Doc. 51, Hamilton's Declaration, exh. B. Fields, however, explains that there was no formal meeting between the unions and management after the grievance was sent back, but that he talked with the Postmaster informally on the workroom floor to discuss the specific use of the casuals. The Postmaster confirms in his declaration that he had a discussion with Fields about the grievance, but that no formal meetings were held after the grievance was remanded to Step 2. The court finds that this argument has no merit.

The plaintiffs also argue in their response that Fields and the unions acted out of "non-member animosity." This allegation appears to be irrelevant. Hamilton stated that he did not withdraw from the unions until March 2005, and Fields stated that he decided not to proceed with the grievance in late 2003 or early 2004. There is no evidence in the record that any plaintiffs other than Hamilton were not members of the unions, and Hamilton's withdrawal of his membership over a year after the grievance was abandoned has no relevance to any claim of unfair representation.

The plaintiffs argue that Fields did not diligently pursue their grievance as evidenced by his limited request for information and clock rings for only one calendar year. Hamilton contends in his declaration that the relevant time periods go back to 2001 and his review of the discovery provided in this case shows that all casual employees worked over 15,000 hours from September

14

2001 to December 2004. This is basically a challenge to judgment calls concerning the processing of the grievance. *See Walk*, 958 F.2d at 1326 (noting that "mere errors in judgment will not suffice"). Also, what Hamilton fails to consider is that the Postal Service may legitimately use casual employees under the CBA and the Das Award. Hamilton, unlike Fields, has made no effort to determine whether the casual employees were properly hired and used by the Postal Service.

Finally, the plaintiffs have submitted the declaration of Martin Christian who claims that in 2001 he was transferred from his bid job processing mail in a seated position because there was not enough work to justify the position. He claims that Fields's wife was allowed to continue processing mail in a seated position even though Christian had more seniority and should have been allowed to keep the bid job. The plaintiffs suggest that Fields's wife was allowed to keep the job in exchange for Fields not filing the grievance. If this was true, however, Fields would not have filed the grievance at all in some effort to placate the Postal Service. But, the grievance was filed and pursued through several steps of the grievance process before Fields decided not to pursue it further. Christian's allegation is nothing more than speculation and does not raise a genuine issue of material fact on the issue of the unions' duty of fair representation.

The court finds that the plaintiffs have failed to come forward with any evidence that the actions of Fields and the unions in processing the grievance were "so arbitrary as to be irrational." Further, the plaintiffs have failed to produce evidence of bad faith or discrimination sufficient to raise genuine issues of material fact. Therefore, the unions' motion for summary judgment must be granted.

### C. Statute of Limitations Defense

The unions argue that any claims the plaintiffs might have related to actions occurring before 2003 are time barred by the six-month statute of limitations. Given the court's finding that the unions did not breach their duty of fair representation, it is not necessary to consider the merits of this defense.

### D. Breach of the Collective Bargaining Agreement

This suit consists of two distinct, but intertwined, causes of action: an alleged breach of the unions' duty of fair representation and the Postal Service's alleged breach of the CBA.

> Because an employer's violation of the collective bargaining agreement is ordinarily only enforceable by the union, however, **the employee can prevail in either suit only by prevailing in both**; the employee must show both that the employer violated the collective bargaining agreement and that the union breached its duty of fair representation.

*Driver v. United States Postal Serv., Inc.*, 328 F.3d 863, 868 (6th Cir. 2003) (emphasis added). The Postal Service argues that since the plaintiffs cannot

16

establish that the unions' actions were a breach of their duty of fair representation, the cause of action against the Postal Service must also fail. The court agrees, and the claims against the Postal Service for breach of the CBA must be dismissed.

### III.  Conclusion

For the reasons stated above, the motion for summary judgment filed by the American Postal Workers Union, AFL-CIO and the Northeast Tennessee Area Local 365, American Postal Workers Union, AFL-CIO will be granted, and the claims against all the defendant, including John Potter, United States Postmaster General, will be dismissed. An order reflecting this opinion will be entered.

ENTER:

*s/ Leon Jordan*
United States District Judge